TP:khs 2/4/2009 4:55:22 PM061717

In the United States District Court
Northern District of Illinois, Eastern Division

Jacqueline Fegan,

      Plaintiff,

      v.

Robert Reid #17285, *et. al,*

      Defendants.

No.: 06 C 6767

Judge Lefkow

Plaintiff's Motion to Compel Compliance with Court's 1/29/2009 Ruling

Plaintiff Jackie Fegan states as follows:

Introduction

Even though this court ruled on 1/29/2009 that plaintiff's counsel was entitled to know the tests the individual defendants' expert would administer to the plaintiff and that the plaintiff could have parties observe or record the examination, the defendant officers continue to refuse to provide plaintiff's counsel with a specific protocol of the tests to be administered and continue to block attempts to have the plaintiff's examination observed or recorded.

    I.    This Court Permitted Plaintiff's Counsel to Receive the List of Tests to Be Administered and to Observe or Record Plaintiff's Examination

    1.    Nearly three years after the filing of Fegan's lawsuit and mere months before trial, the individual defendants stated their intention to seek the examination of Ms. Fegan.

    2.    After Fegan's counsel made several attempts to prompt defendants into conformity with Federal Rule of Civil Procedure 35, this matter was brought before the

1

court on January 29, 2009 on defendants' "emergency" motion to extend expert discovery.

3. The court ruled that Fegan's counsel was entitled to know the tests the defendants' expert would administer and that pursuant to a protective order Fegan's counsel, but not Fegan, could learn of the tests. Page 11, lines 2-4 of the transcript of the 1/29/2009 proceedings is attached and incorporated herein as Exhibit 1.

4. The court ruled that the examination could be videotaped or observed. Page 13, lines 19-21 of the transcript of the 1/29/2009 proceedings is attached and incorporated herein as Exhibit 2.

5. Mindful of the issues involved for a prompt examination, Tomas Petkus, one of plaintiff's counsel, e-mailed the individual defendants' counsel the same day as the hearing a draft protective order consistent with this court's ruling. A copy of the order is attached and incorporated herein as Exhibit 3.

    II.    <u>Defendants Defy Federal Law, State Law, and Court's Order in Refusing to Permit Third Party Observation or Recording</u>

6. Despite the emergency nature of her motion, defendants' counsel Susan Sullivan responded to Mr. Petkus's e-mail days later, making vague reference to concerns regarding the logistics of the request to observe and videotape the examination as well as "third party observation issues." Sullivan represented to Mr. Petkus that a separate letter would address these concerns. Sullivan represented that the court did not resolve the issues. To date, Sullivan has yet to provide an alternative protective order. On the eve of this motion's filing, Sullivan e-mailed Craig Tobin, one of Fegan's counsel, with a litany of objections and excuses. She denied that this court ordered the protocols and refused to permit the observation of plaintiff's examination, citing privacy and logistical concerns as

well as complaining that nobody observed Dr. Cox test Fegan. Sullivan offered no basis for her late refusal to obey the court's ruling.

7. Fegan's counsel made several attempts to conduct a Rule 37 teleconference, but they were unsuccessful.

8. The defendants have no basis to object to third party observation of Fegan's examination. This court permitted it on January 29, 2009. Moreover, both Illinois and the Seventh Circuit allow third party observation of a plaintiff's examination. *See* 735 ILCS 5/2-1003(d) ("...the plaintiff has the right to have his or her attorney, or such other person as the plaintiff may wish, present at such physical or mental examination.") and *Zabkowicz v. The West Bend Co.*, 585 F. Supp. 635 (E.D. Wis. 1984) (holding that since the defendants' expert was engaged to advance the interests of the defendants, the plaintiffs, at their option, were entitled to have a third party – including counsel – or a recording device at the examination).

9. In fact, third party observation and recording of plaintiff examinations is so routine that the firm Dr. Hartman consults with, Cavanaugh & Associates, have rooms designed specifically for observing and recording examinations. If defendants' purported expert has any experience with these types of examinations, he knows the procedures for their observation or recording.

10. Defendants sought a prompt examination of Ms. Fegan. Now, their purported sense of urgency stands in sharp relief to the fact that although Fegan's counsel timely provided a protective order to Sullivan following the court's 1/29/2009 ruling permitting observation or recording, defendants' counsel continues to delay. They refuse to recognize or adhere to the court's 1/29/2009 ruling.

    III.    <u>Defendants Refuse to Provide the Tests to Be Administered at the Examination in Defiance of Federal Law, State Law, and Court's Very Order</u>

11.    Sullivan tendered a letter from the defendants' medical expert Dr. Hartman, dated the day after the hearing. A copy of this letter is attached and incorporated herein as Exhibit 4.

12.    The letter failed to articulate the tests to be used at the examination as ordered by the court. Instead, the letter provided a non-exhaustive list of over sixty tests that <u>could</u> be administered to Ms. Fegan. Dr. Hartman was unwilling to specify which of the sixty-plus possible tests he would administer, claiming Fegan's counsel would share the test list with Fegan in an attempt to subvert the tests' validity. This baseless aspersion upon Fegan's ethics and the ethics of her counsel is deplorable. This court ordered attorneys eyes only protection. Dr. Hartman's unfounded attack upon the ethics of Fegan's counsel is nothing more than an excuse to justify noncompliance.

13.    Dr. Hartman also claimed the wide variety of tests was needed because he cannot not anticipate Ms. Fegan's condition on the date of the examination. This is ludicrous, as the defendants have been in possession of Dr. Cox's report, Ms. Fegan's medical records and deposition transcript, as well as the transcripts of witnesses, treating physicians and Ms. Fegan's own medical expert for months.

14.    Dr. Hartman's concerns about the subversion of his tests are nonsensical. These tests are designed to detect and expose malingering and would do so if Fegan attempted to fake her symptoms or conditions. Plaintiff's counsel is entitled to know the tests defendants' expert will administer. The non-exhaustive list of over sixty possible tests blatantly disregards the court's order.

Conclusion

Wherefore, the plaintiff prays that the court order that defendants provide a detailed and specific "attorney's eyes only" protocol to Fegan's counsel detailing the scope of Dr. Hartman's examination of Fegan and the tests to be administered to her on or before a date certain prior to her examination, that Fegan's examination take place with the plaintiff provided the opportunity to have counsel present and audio- and videotape recording throughout the examination, and for such other and further relief as the court determines is warranted.

Wednesday, February 04, 2009                             Jacqueline Fegan, plaintiff

                                                            By:  s/ Craig D. Tobin
                                                                 One of her attorneys

Under penalty of perjury the undersigned states that the factual recitation of the efforts to resolve the discovery disputes in this case stated above are true.

Wednesday, February 04, 2009

                                                                        By:  s/ Karl H. Schook

Certificate of Service

I hereby certify that on Wednesday, February 04, 2009 I served the foregoing by using the court's CM/ECF system which will send notification of such filing to the counsel of record.

Wednesday, February 04, 2009

                                                                              s/Craig D. Tobin
                                                                              Craig D. Tobin

Craig D. Tobin
Tomas Petkus
Karl H. Schook
Tobin Petkus & Muñoz, L.L.C.
Attorneys for Plaintiff
Three First National Plaza, #1950
Chicago, IL 60602-4298
Office (312) 641-1321
Facsimile (312) 641-5220
Email   ctobin@barristers.com
         tomaspetkus@barristers.com
         khschook@barristers.com

\\Ma01\data - client\Tobin, Craig\Fegan v. City\Motions\motion, compel compliance with 1-29-2009 ruling.doc

# Exhibit 1

1  to. We don't have to take his word that they're normal tests.
2  THE COURT: Okay. Well, that can be handled with a
3  protective order. You counsel are allowed to know what the
4  tests are. You're not allowed to tell her what they are.
5  MR. PETKUS: And that's perfectly reasonable.
6  THE COURT: So that can be resolved that way. So I
7  will --
8  MR. TOBIN: Could we submit an order to Court if this
9  is going to take place? Because that's what we tried to do.
10  THE COURT: You know, it seems to me that the letter
11  here that Miss Sullivan read from is pretty reasonable, and it
12  sounds like this man is a professional and board certified. So
13  I have to rely on his ethics that he's not going to do
14  something inappropriate, right?
15  MR. TOBIN: Judge, I don't think that's the rule or
16  the comments interpretation. The state law would suggest that
17  to protect yourself, to protect us, and protect the client, we
18  have a right to say tell us what you're going to do whether the
19  client says --
20  THE COURT: Right. I understand that.
21  MR. TOBIN: We also have a right to videotape I would
22  believe this exam.
23  THE COURT: Where do you get the right to videotape
24  because I didn't --
25  MR. TOBIN: I think it's in --

# Exhibit 2

1   videotaped and we have no way -- and their expert's going to
2   rely on those scores. This is a board certified psychologist
3   and neuropsychologist who has given the protocol exactly what
4   he's going to do. It's listed out in the two-page letter.
5       With regards to videotaping there's no need, and it's
6   probably not appropriate under the testing.
7       THE COURT: Well, I wonder about that. But is there a
8   way that this could be observed and she not be aware of it?
9   Or, you know, these two-way glass --
10      MR. PETKUS: Dr. Cavanaugh's office where Dr. Hartman
11  received some of his training is equipped. They have examining
12  rooms with two-way mirrors just for this purpose so that the
13  lawyers can sit there and watch what's going on and the video
14  camera can tape what's going on. And the protocol that we
15  asked them to meet, which is also attached to the motion, it's
16  all got the black out on it, that's the type of Dr. Cavanaugh
17  uses, and that's, in fact, one of his office's protocols for
18  this type of examination.
19      THE COURT: Well, that seems to me to be the way to
20  handle this. Either to videotape or to permit observation
21  where she is not aware that you're watching.
22      MR. PETKUS: We're less concerned about that, Judge,
23  than we are about what tests are going to be administered.
24      THE COURT: Okay. So that's resolved in your favor
25  with the protective order.

# Exhibit 3

FAM: 1/29/2009 3:01:44 PM

In the United States District Court
Northern District of Illinois, Eastern Division

| | |
|---|---|
| Jacqueline Fegan, <br><br> Plaintiff, <br><br> v. <br><br> Robert Reid #17285, James Young #8883, <br> Michael Drew #13167, Denis Doherty #8222, <br> and the City of Chicago, a municipal Corporation <br> and body politic, <br><br> Defendants. | No.: 06 C 6767 <br><br> Judge Joan Lefkow |

<u>Order for Medical Examination Pursuant to F. R. Civ. P. 35</u>

This cause coming on to be heard on the motion of the defendants for a medical examination of the plaintiff by Dr. Alan Hartman, Ph.D. the court orders as follows:

1. Dr. Hartman shall supply a complete protocol specifying all of the tests he intends to administer to plaintiff's attorneys for their and their consultants' eyes only on or before 5:00 p.m. on February 2, 2009.

2. To alleviate Dr. Hartman's concerns of pre-test coaching, the plaintiff's lawyers shall not disclose, communicate or reveal his testing protocols to the plaintiff.

3. Dr. Hartman shall conduct the examination of plaintiff pursuant to and in conformity with the protocol filed with the court as an exhibit to defendants' January 28, 2009 emergency motion to reconsider which was decided on January 29, 2009, except as to any testing he performs.

4. All testing conducted or administered during the examination of plaintiff by Dr. Hartman shall be done in strict conformity with the testing protocol he is supplying pursuant to paragraph one of this order.

1

2

5. Dr. Hartman shall conduct his examination in facilities that are designed to and which have the ability to accommodate observers, such as an examining room with a one way mirror.

6. Plaintiff's counsel or their designate, including a videographer, shall have the right to observe and videotape the entire examination conducted by Dr. Hartman.

7. Dr. Hartman may not administer any other tests to the plaintiff during the examination other than those detailed in the protocol referred to in paragraph one of this order.

8. The examination shall take place on February 10, 2009 starting at 9:00 a.m. and shall end no later than 4:30 p.m. The plaintiff may take a lunch break for 60 minutes at about noon, as fits the pace of the examination.

Date: _____                              ENTER:

                                                   _____
                                                   JOAN HUMPHREY LEFKOW
                                                   U.S. District Judge

Craig D. Tobin
Tomas Petkus
Karl Schook
Tobin Petkus & Muñoz, L.L.C.
Attorneys for Plaintiff
Three First National Plaza, #1950
Chicago, IL 60602-4298
Office (312) 641-1321
Facsimile (312) 641-5220
Email: ctobin@barristers.com
       tomaspetkus@barristers.com
       khschook@barristers.com

\\Ma01\data - client\Tobin, Craig\Fegan v. City\Motions\order, med exam and protective.doc

2

# Exhibit 4

# David E. Hartman, Ph.D., ABN, ABPP

Medical and Forensic Neuropsychology
Office: 312-879-1111   Fax: 847-433-6782
216 South Jefferson, Suite 302
Chicago, Illinois 60661



Friday January 30 2009

TO:   Ms. Susan Sullivan
      Attorney at Law

RE:   *Fegan v. City*
      Request for pre-examination test disclosure.


Dear Ms. Sullivan:

Regarding specifics of the planned examination in this matter, in general, a psychological and/or neuropsychological examination consists of several parts: a clinical interview, objective testing of symptoms and problems noted in the interview of clinical concern, and questionnaire-based evaluation of emotional and personality factors. Such an evaluation typically takes place over an eight-hour day, including lunch and *ad lib* rest/bathroom breaks.

The <u>clinical interview</u> consists of a private conversation between the client and myself to determine understanding of problems, past history and present symptoms. The interview typically lasts from 1-2 hours. The nature and pattern of reported symptoms and problems as expressed in the interview helps direct subsequent cognitive and emotional assessment. Prior to the interview, the client will be asked to complete personal and symptom questionnaires to provide information that can be elaborated and clarified during the interview.

The second part of the examination is related to objective assessment of symptoms reported during the interview and/or of concern for clinical reasons. There is typically a test to screen general intellectual functions to form a baseline of the individual's general ability levels. Typical assessment tools for this functional domain include Wechsler Adult Intelligence Scale 4th Edition — (WAIS-IV), The Reynolds Intellectual Screening Test (RIST) the Wechsler Abbreviated Scale of Intelligence (WASI), the Kaufman Brief Intelligence Test – 2 (KBIT - 2), the Test of Non-Verbal Intelligence 3 (TONI-3), the General Ability Measure for Adults (GAMA), the Shipley Institute of Living Scale (SILS) or other similar tests.

Examination of other psychological functions, to the extent this is made necessary by clinical judgment and/or patient description of such complaints in the interview, is conducted with a variety of other tests of cognition and behavior. The tests comprise a *flexible battery;* a standard form of assessment within my profession, which consists of individual tests that objectively measure various symptoms and behavioral problems. Since test choice is to a large extent structured around the condition of the evaluatee at the time of the examination, the exact order and number of tests to be administered cannot be specified in advance. Knowing which tests will be necessary in advance is equivalent to knowing that only a certain set of symptoms will be expressed *before* the individual is seen. Such specification unreasonably limits the capacity of the examining expert to objectively evaluate symptoms presented at that time. A preset test format prevents the possibility of exploring questions that are not predicted in advance.

Moreover, even if the exact pattern of patient complaint were knowable in advance, it is neither scientifically general practice nor ethical to specify an exact list of tests in advance. If exact information is made available to the client's attorneys, there is nothing to prevent the client or the client's attorneys from attempting to prepare for the examination; this violates standard testing conditions required to ensure test validity — knowing exactly which tests will be administered beforehand violates a basic tenet of examination – that clients not have exposure to or experience with the test beforehand.

The tests that *could* be administered are generally accepted in the professions of neuropsychology and clinical psychology. They are non-invasive and presented in oral, written or computer-based formats. Patients typically find them interesting. Depending upon patient presentation and current complaint, a selection of tests from among more than one hundred possible tests will be presented over the course of a full day. Some of the tests that could be administered for cognitive, behavioral, emotional and personality assessment include:

Trauma Symptom Inventory, Millon Clinical Multiaxial Inventory III, Chronic Pain Battery, Symptom Checklist 90-Revised, Adult Self-Report Checklist, Millon Behavioral Health Inventory, Cognitive Distortion Scales, Clock Drawing Test, Minnesota Multiphasic Personality Inventory-2, Detailed Assessment of Posttraumatic Stress, Hooper Visual Organization Test, Memory Assessment Scales, Wechsler Memory Test IV, Trail-Making Tests, Neuropsychological Assessment Battery: selected modules, Hamilton Depression Inventory, Hand Dynamometer Test, Color-Trails Test, Multidimensional Self-Esteem Inventory, Wisconsin Card Sorting Test, Luria Nebraska Neuropsychological Test Battery, Sentence Repetition Test, Tactual Performance Test, Controlled Oral Word Association Test, Neo Personality Inventory, Grooved Pegboard Test, Warrington Memory Test, SCAN-A Test of Auditory Processing, Omni IV Personality Disorder Inventory, Halstead-Wepman Aphasia Screening Test, Gordon Diagnostic System III Test, Iowa Gambling Test Seashore Rhythm Test, Fingertip Number Writing Test, Speech Sounds Perception Test, Benton Visual Retention Test, Hand Dynamometer Test, Canter Background Interference modification of the Bender Visual Motor Gestalt Test, Paulhaus Deception Scales, Wide Range Assessment of Memory and Learning – 2, Memory Complaints Inventory, Judgment of Line Orientation Test, Memory for Designs Test, Grey Oral Reading Test, B Test, Seashore Rhythm Test, Rey-Osterrieth Complex Figure Test, Reitan-Klove Sensory Perceptual Examination, Purdue Pegboard Test, State-Trait Anger Expression Inventory, Rey Auditory Verbal Learning Test, California Verbal Learning Test 2, Category Test, Grooved Pegboard Test, Continuous Visual Memory Test, Spatial Relations Test, Personality Assessment Inventory, Computerized Test of Information Processing, Test Brief Test of Attention, Benton Facial Recognition Test, Grey Silent Reading Test, Dementia Rating Scale-Revised - 2, Paced Auditory Serial Addition Test, Minnesota Rate of Manipulation Test, Brief Visuospatial Memory Test, Symbol Digit Modalities Test, Vigil Continuous Performance Test, etc.

As previously discussed, all procedures are within the domain of clinical psychology and clinical neuropsychology. I will personally conduct all procedures. The client is allowed brief rest breaks, *ad lib*, at convenient test breakpoints, as well as a lunch break. The client would be expected to obtain a usual amount of sleep the night before the evaluation, and to have a nourishing breakfast on the morning of the evaluation. The client must bring eyeglasses and/or hearing aids if they are worn, and also all present prescription and non-prescription drug vials for inspection. No alcohol is to be drunk for 24 hours prior to the evaluation and the client is not to take sleeping pills the night before, nor use sedating or narcotic medications on the morning of the evaluation. In particular, clients are requested not to take any drugs in the benzodiazepine-family of medications (e.g., Valium; Xanax) on the day of the evaluation if this is medically feasible, nor any other tranquilizers, muscle relaxants or sedating

antihistamines (e.g., Benadryl) on the morning of the evaluation (there is no problem with antidepressants). Medications required for medical control of hypertension or other chronic illness does not require changes in administration, although if sedating pain medication is taken, it should ideally not be taken on the morning of the evaluation. Such medications may be brought to the office and taken later in the morning. Coffee or tea may be drunk as per usual.

The evaluation will be conducted at my 216 South Jefferson, Suite 302 office, with a large testing table and comfortable chairs. Questionnaires may be completed at a desk or seated on a comfortable chair or couch. The client may have breaks at convenient points as requested. Casual, comfortable clothing is acceptable. Lunch money and parking money are typically required (about $30.00 total). The client should have a nourishing breakfast and have attempted to achieve a normal night's sleep the night before. If the client reports difficulty reading long questionnaires or a reading level below 9th grade, please contact me for additional discussion on such an issue.

Please also contact me at your convenience if there are further questions about this issue or if I may be of service in other matters.

*David E Hartman PhD*

David E. Hartman, Ph.D., ABN ABPP
Clinical Psychologist and Neuropsychologist
Diplomate: *American Board of Professional Neuropsychology*
Diplomate: *American Board of Professional Psychology, Clinical*
Illinois license 071-003149